We're ready for argument in our first case, Ohio Valley Environmental Coal Issue v. Army Corps of Engineers. Mr. Morgan. Good morning. May it please the court. Peter Morgan for appellants. This appeal involves a challenge to the decision of the United States Army Corps of Engineers to issue a permit to Ravencrest Contracting, authorizing coal mining through almost three miles of streams in West Virginia without considering the significant studies documenting the negative impacts of that surface coal mining on human health. I'd like to make three key points about this appeal. First, to be clear, the geographic scope of the Army Corps' jurisdiction is not in dispute in this case. But let's be clear about the activities that the court did authorize within its defined jurisdictional scope. Mr. Morgan, in order for you to prevail, don't we have to, if we disagree with you that this case is distinguishable from Maricoma, doesn't that dispose of your case? Don't we have to agree, don't we have to accept your argument that Maricoma is materially distinguishable? I believe that's correct, Your Honor. And let me address Maricoma because it is important. I think it is actually easily distinguishable from the facts of this case. The Maricoma decision was based primarily on this court's acceptance of the Army Corps' argument that the only activity within the Corps' jurisdiction, which in that case was creating an underdrain system for the valley fill, could be geographically partitioned from the activities that were most likely to produce the alleged environmental impacts, which in Maricoma were ecological impacts to the streams. Now, in sharp contrast, in this case, the activity that the Army Corps authorized within the jurisdictional streams, the in-stream coal mining, and to be clear, in this case, that's mining through almost three miles of streams, a total area of 41 acres, which is three times the size of the capital grounds outside the windows. That authorized activity itself creates the environmental harms leading to those human health impacts that are central to this case. And so it's that distinction that in Maricoma... I'm sorry, just so I understand, what are you saying that the Corps authorized here? The Corps authorized 41 acres of coal mining in the streams. But the Corps doesn't have jurisdiction to authorize coal mining. Well, the Army Corps' own regulations under NEPA make clear that it has to consider the environmental effects of whatever activity it authorizes within its jurisdictional scope. But that's not... I don't think that's Judge Harris's question, or at least it wasn't my question. So perhaps... I also was struck by what you articulated as the breadth of what the Army Corps was doing here. And one of the things I thought we made pretty clear in Maricoma is that it is the proper state authority that is responsible for determining a large number of things that you are attributing to the Corps' jurisdiction, including water quality standards that take into account water pollution's effects on human health. Well, Your Honor, the distinction is the analysis of the state permitting under the Service Mining Act and the Clean Water Act really was directly relevant in the Maricoma decision to the question of whether the Army Corps could extend or must extend the scope of its jurisdiction to cover the entire mining area. The test under NEPA and under the Corps' NEPA regulations for that talks about the degree of federal control and responsibility over that upland impact outside of the jurisdictional waters. That issue is not in play in this case. And so in this case, then, we have to look at what do the Army Corps' own NEPA regulations say about what effects it has to consider for the activities it authorizes within its scope of jurisdiction. And again, the Army Corps' own NEPA regulations provide the example of a pier that's permitted within jurisdictional waters. It makes clear that all of the environmental effects of that authorized activity, the full pier, not just the dredge and fill activities, must be considered. Well, in Maricoma, we defer to the Corps' regulations, unambiguous regulations, in addressing the specific activity. And that 404 is unambiguous about the confines of what the Corps is authorized to commit under the Clean Water Act. Isn't that equally applicable here? With respect, Your Honor, no. Because again, that part of the Maricoma decision was dealing with the question of whether the Army Corps must extend the scope of its jurisdiction to include the upland mining areas outside the jurisdictional footprint defined by the Corps. This Court, I feel like the more relevant decision to the issue in this case, which is what does the Corps have to consider within its jurisdictional area, the relevant case there is the Hughes River decision from this Court, where the Army Corps authorized construction of a dam in the jurisdictional waters, but was then required by this Court under NEPA to consider the full range of direct and indirect effects that flowed from the permitting of that dam. So the authorized activity was the dam, but there were indirect effects. In that case, the introduction of invasive species that the Corps had to consider the effects of. And that's a much more attenuated chain of causation between the authorized activity and what the Corps had to consider than we have in this case. In this case, the authorized activity is surface coal mining occurring within the streams. And the effects that the Corps is required to consider are the human health impacts of that surface coal mining. Well, I'm so sorry. I was just going back to our coma in which we pointed out that under the Surface Mining Act, it's the state of West Virginia that has exclusive jurisdiction over the regulation of surface coal mining. That is correct. But NEPA and case law interpreting NEPA are clear that just because there's another permitting scheme or another agency engaged does not absolve the Army Corps of its responsibility to also consider those issues. What does exclusive jurisdiction mean? Well, that is the jurisdiction and the authority to issue the surface coal mining permit, which authorizes a whole range of activities. But I think an important thing to note is that the Surface Mining Act itself includes a savings clause, which explicitly states that the presence of SMACRA and the SMACRA permitting scheme does not absolve an agency of its NEPA authority. I'm sorry. I want to defer to my colleague. Well, even given your interpretation of how this should be applied, what we are left with is the Corps interpreting its own regulations, the NEPA regulations. So aren't we to give deference to their interpretation of their regulations? That sort of deference, the hour or seminal rock deference, is only due when there's ambiguity in the regulation itself. And with respect, the Army Corps' NEPA regulations, again, provide an example in the regulation itself of the authorized activity not being just dredge and fill, I think ARACOMA creates at least an ambiguity. I mean, I understand your interpretation, and maybe a reasonable one, but ARACOMA seems to, and I understand how you distinguish it, but nonetheless, it's there. Don't you think that makes it somewhat ambiguous? Well, I would point this, I do not, because I think that the bright line can be drawn between the cases, and I think other authority from the Fourth Circuit beyond ARACOMA also speaks to this issue. I mentioned the Hughes River case. There's also the North Carolina v. FAA decision, where this court said that NEPA precludes an agency from avoiding the Act's requirements by simply relying on another agency's conclusions about a federal action's impact on the environment. If we find this ambiguous and we apply this level of deference, or whichever level is applicable, do you lose? No, Your Honor, because the deference that's owed to the Corps cannot absolve the Corps of its responsibility to at least engage with these issues, at least conduct some level of analysis saying, here's how the Surface Mining Act or the Clean Water Act discharge permits address human health, and here's how those issues satisfy the Corps' own obligations under NEPA. And that level of analysis, that discussion of that issue, is completely absent from the record. And so absent that, there's really nothing in the decision document for this court to defer to in terms of the Army Corps' judgment as to whether or not the Clean Water Act and the Surface Mining Act adequately addressed these questions that the Army Corps has to consider for any direct or indirect effects coming from the authorized activity. And again here, the authorized activity, as the Corps itself acknowledges throughout the decision document, is coal mining. It's the removal of coal and the actions... It just seems like if the Corps authorized coal mining, that's a whole separate problem, right? The Corps has no business. Is it your view that if Ravencrest just had this 404 permit, they could go in and start coal mining? No, Your Honor.  The activity that they... The Corps certainly... I would look at the obverse of your question. The Army Corps by itself couldn't authorize the removal of coal, but the Army Corps does have the authority to prohibit coal mining if it did not issue the 404 permit. Which is exactly what was going on in Arikoma, right? You can shut this thing down if you don't issue the 404 permit, and we said that doesn't mean that the 404 permit process has to take account of the effects of the mining. Except again, Your Honor, the important distinction is the mining happening in Arikoma was happening completely outside of the Army Corps' scope of jurisdiction. It was all in the upland area. And so the question then again was, does the Army Corps have the authority to influence mining happening outside of jurisdictional streams? In sharp contrast... Because let's be clear, in Arikoma, the only activity happening within the jurisdictional stream was the creation of an underdrain system for the valley fill. All of the coal removal, the coal mining, everything covered by the Surface Mining Act was happening on the upslope area. In contrast, in this case, it's the mining itself that's happening through the jurisdictional streams, and therefore you can't draw the geographic bright line that was of such importance in the Arikoma decision. This is helpful to me because I think I understand better where maybe I wasn't understanding your point. So you read Arikoma as resting on a geographic line, and I guess I read it as resting on a jurisdictional line, just that the Corps is not allowed to regulate anything but the actual discharge of the material, not the mining. And so it's not where it's taking place, it's sort of more of a who's in charge line. But you're saying I can read that decision as turning on the geography of the question. Let's see, my time is up. May I answer that? Yes, absolutely. I think that's a really key distinction. And I think part of the... So yes, we are absolutely arguing that that geographic line is central to the holding in Arikoma. It doesn't apply to this case. Could you tell me where? Because when I read Arikoma, the language is, to me, fairly clear that it's making a jurisdictional determination about who has jurisdiction over activities. And it speaks extensively in terms of the Corps' ability to determine jurisdiction with respect to activities not based on... that I saw on jurisdictional line drawing. And perhaps you could think about that. And we'll have some time on rebuttal. If you could help me out, I'd appreciate it. Very good. Thank you. Mr. Oakley? Yes, Your Honor. My name is Robert Oakley. I'm here on behalf of the Corps of Engineers. The Council for Brave and Impressed is also sitting at Council's table. We're splitting the time. I'm taking 15 minutes. I would like to start with Hughes River almost for a personal reason. The first case I ever argued in the Fourth Circuit was one of the Hughes River cases. And it's easy for me, with that memory, to draw a big number of distinctions and show why that case actually is not at all helpful to OVEC in this case. They say Hughes River shows where you have federal control of a certain level, then the federal government needs to look at the entire project. Well, the only involvement here by the Corps was the issue of squirrels. In contrast, the Hughes River project involved a lot of agencies other than the Corps. One federal agency paid for the dam, which created this reservoir. Another federal agency designed the dam. Now, when you get to that point, the federal control is pretty pervasive, and it made sense to do as was done in that case. Environmental studies of the entire project. Here you have the Corps issuing a permit, allowing bills in certain streams. There's some confusion. First, let me back up and say we did not realize, when I say we, I'm including Raven Risk, that OVEC was only talking about the mine freeze here. And there's some questions as to how much acreage that confirms. We think it's about one acre. They say 41 acres. I don't know that that matters. The point being that if you look back at the Arikoma case, the Arikoma case looked to what is it that the Corps was issuing a permit for? And it was issuing a permit for placement of fill in waters of the United States. As counsel for OVEC conceded, the Corps cannot authorize coal mining. If they went ahead with their Section 404 permit, even if they stuck to the mine freeze, they could not mine coal legally. They'd be in trouble with West Virginia or SMACRA. Can you explain to me the difference between dredging and filling and mining through streams? Well, I think... And I'm asking,  mining through streams may be different than dredging and filling, which we talked about in Arikoma, and there may be a difference in terms of how it comes out depending on which one you consider doing, if you will. I'll do my best, but I think the best answer I can give you is that this is an activity that is regulated by different statutes, and in this case, because of the way SMACRA is set up, different sovereigns. I do not believe, counsel for Ravencrest may correct me on this, that there's a fine line between the dredging that would be done in the stream or the fill placement that would go on anyhow versus that which would go on for coal mining. But we come back to the Corps can't issue a permit for coal mining. Now, this court heard an argument in Arikoma case, a sort of but-for argument, which is, well, if, you know, Corps, you could pull the plug, if you pull the plug on your 404 permit, the coal mining couldn't go forward. But that sort of but-for logic was rejected by the Supreme Court in the public citizens case, the case that involved the Mexican trucks and NAFTA and the question of whether, although an agency in that case had no power to stop or control over the trucks, Mexican trucks coming into the country, they had to look at the environmental impacts of those trucks. And the Supreme Court expressly rejected in the context of NEPA any sort of but-for reasoning as creating the obligation of a federal agency to do NEPA to address something beyond the scope of its power. And that's the same thing here. Does the ARAKOMA case inform or control our decision here? Is that the key case? I really think it does, Your Honor. Everything you're saying, if we just follow ARAKOMA, you don't have to say anything else. Is that what you're telling me, or is there something beyond ARAKOMA we have to listen to and get into? There really is not. There is not. The court, for example, to go to Judge Duncan's question. So when I ask that, you are moving, what are you saying? If you say ARAKOMA controls and that's it, are you now arguing an alternative where a judge, if you don't think it controls, then this is the case? I'm not trying to shut you off. I'm just trying to understand why we are hearing all this stuff when it sounds like to me if your best argument is ARAKOMA, you would get up and say that's it and then say, well, anybody got any questions or my brief here talks about the other stuff, that's it unless you disagree. And I'm just throwing that out. Your Honor, my opinion is that to rule differently in this case, you would need to go on long and overturn ARAKOMA, which a three-judge panel obviously you can't do, but you'd have to do. However, I've spent a lot of time in circuits that don't necessarily follow their own precedent. Mr. Oakley, Mr. Morgan crafted a distinction that I hadn't really thought of before and said that ARAKOMA is geographically limited and perhaps it would be useful if you were to address that. Yes. I did want to go to that point because I think that's just Any time now. Misreading of ARAKOMA because the court stresses, it quotes the language from the statute that under the SMACRA statute, West Virginia now has exclusive jurisdiction and the court could not invade that jurisdiction on the context of the facts of ARAKOMA or the context of this case. The court cannot issue a SMACRA permit. It is West Virginia's job to do so. If they weren't happy with the West Virginia permit or West Virginia analysis, they should have challenged the West Virginia permit in the appropriate court. So what you're saying, I take it, is that ARAKOMA is not geographically limited. It focuses on the respective jurisdictions of the state permitting entity and the federally designated jurisdictions. There's a long discussion of jurisdiction. While I don't have the opinion memorized, I recall no discussion of geographic distinctions. But it was extremely important to that panel that decided ARAKOMA that the SMACRA statute gave West Virginia the power to regulate surface mining in West Virginia. And that is basically our argument. The Sixth Circuit found this court's decision in ARAKOMA very persuasive. That's not controlling a fine. But I think that another court of appeals also agreed. And that case involved mine-throughs that the courts What's a mine-through? A mine-through is, as I understand it, is where the mine coal is actually extracted from the stream bed. And that happened That was expressly addressed in the Sixth Circuit decisions, the Kentuckians case. There has been some back and forth as to whether ARAKOMA involved mine-throughs. And you can't tell from the court's decision, this court's decision in the ARAKOMA case whether it did or not. There's been some back and forth on the record. So I'm not going to bring I probably shouldn't pursue that further given that we have the record that we did before the court. The ARAKOMA decision did involve I think solely a valley field project? It did involve valley fields, which interestingly this does not. That is the problem of taking Well, that interesting part, is that a distinction? That this does not and that did? If it's a distinction, it's certainly I don't think it matters legally. But in terms of the environmental impacts, this mine will have fewer because it's not going to be dumping the tops of mountains down in the valley. The spoil, as they call it, they can't put the they can't repack the soil as tightly as it was before. So they have to take it somewhere it's going to go into a permitted discharge site. Can I ask you to address the pier example from the regulations that your colleague has pointed out that in defining specific activity, the example that the pier, which doesn't talk about the discharge of materials that's involved in building a pier, but the pier itself? Is that anything we need to think about? I don't think that's well, to begin it's not it's both an example and it's not as on point as this court's decision in Aracoma. But the other thing is that in Aracoma and this was very important to that panel, you had a separate jurisdictional entity. I mean, the jurisdiction was not was with the state and under SMACRA issued a permit for the mine and it was not for I mean, the pier example you don't have any overlapping statutory scheme. Is my understanding correct that there's no federal law that gives states exclusive jurisdiction over piers? No, I think you're correct. I mean, it's an example someone made up when they wrote the regulations and it doesn't involve any kind of statute like SMACRA. So I think I'm cutting into my co-counsel's time unless the panel has additional questions. And it would be interesting to know what he's going to say about  I'm Mr. Krause and I represent the appley intervener contract. And I do think the court has a pretty good understanding of the relevant issues in this case. There are only a couple of things I'd like to talk about. It would be helpful for me if you would speak a little more directly into your mind. Oh, sure. Sorry about that. First time. I want to clarify something about the total scope of this project. In the court's decision document they note that the 404 permitted activities only comprise one-tenth of 1% of the total scope. So they don't talk about generalized mining activities. They don't talk about entire mining operations. When they do talk about a particular mining method, they talk about mountain top mining with valley  plain  mountain top as well.  the state did the Department of Environmental Protection in assessing the surface mining permit as well as the NPDS penalty and they have to assure that all the water that discharges from this mine meets water quality standards and these water quality standards are developed to protect public consumption recreation even aquatic life  I think the health studies that were presented by the plaintiffs by OVAC only they don't even talk about any exposure pathways whether it's water or air or whatever, they don't even explore any causal mechanism that connects mining with any kind of adverse health effect I'm sorry I don't want to interrupt your response please go and I believe the fact that the Corps actually did note that the state had the Corps acknowledged the state's analysis of airborne dust that would be expected to result from this mine and how it might affect neighboring communities as well as the state's analysis of the quality of the water that would be discharged and that it would meet water quality standards that are designed to protect public health as far as meeting consumption standards and the like I think the Corps did more than an adequate job of acknowledging that other states and the state that does have the exclusive jurisdiction over the actual surface mining activities that comprise 99.9% of the mine that I think it addressed health adequately There are four permits that are required, is that about right? Yeah, four permits or licenses you have So maybe you could walk through what each of them covers Sure, I think the primary one that we've been talking about is the surface mining permit that covers every inch of dirt that's moved on the permitted property You also have a series of Clean Water Act certifications and those are also delegated by the state You have the 401 certification that certifies that any discharges will meet water quality standards and you also have the 402 permit which controls the downstream discharges from the mine That, you know, in downstream waters and other tributaries, the water that is discharged from the mine will not cause or contribute to water quality violations And that's also a state permit? Those are all state permits. The only federal permit is the 404 permit that we're here to talk about today Those were the only points I specifically wanted to address If you have any other questions Otherwise, based on the foregoing, I respectfully ask you to affirm this report Thank you Let's revisit Aricoma, shall we? Indeed I think the answer to your question,  is found on page 194 This is really the heart of the negotiation between that decision and our case And in the first full paragraph on page 194 This court quotes the Army Corps' own NEPA regulation which says that the Corps' implementing regulations specify that the proper scope of analysis for NEPA review is One, to address the impacts of the specific activity requiring a Department of the Army permit. That's what we're saying has not happened here And two, those portions of the entire project over which the Corps district engineer has sufficient control and responsibility to warrant federal review It's that second prong That's where the question of the existence of these state permitting schemes comes into play Because of the existence of those state permitting schemes this court held the Army Corps did not have control and responsibility over the upslope actual mining activities. What the Aracoma Court did not grapple with what we're asking this court to address is the first prong which again is the specific activity requiring a Department of the Army permit And what you did not hear the Army Corps or Ravencrest say just now, they didn't identify any activity happening within the Army Corps scope of coal mining. And just as in the example in the Army Corps NEPA regulations of the pier being a specific activity and just as in Hughes River the specific activity was the dam You're saying that the specific activity is coal mining? And the other disturbances associated with that coal mining Anything relating to coal mining is the specific activity Anything happening within Under the rubric of coal mining That's correct. Anything happening within the jurisdictional stream, and in this case the only thing happening within the jurisdictional stream is coal mining. To accept the other argument... But you have to... The next paragraph after the one you read says that the regulations are unambiguous in requiring a district engineer to address the impacts of the specific activity requiring a DA in other words the permit that is being sought the 404 permit That's right. So that very next paragraph cabins what you just very clearly cabins what you just read to me. No your honor, because there was no surface mining happening in the streams in Aracoma. It doesn't matter. It's not so limited At the end of that paragraph the Aracoma Court identifies the specific activity at issue That it's looking at there, yes. Right. And it's not a generic dredge and fill activity. In that case it's the creation of an under drain system for a larger valley fill It's not a dredge and fill activity. Just as in this case, it's not dredge and fill activity It's all of the work that is required to conduct surface coal mining. It's the blasting of the material. It's the scraping it away It's the taking out of the coal and it's putting the material back. And as the attorney for the court just acknowledged, the material that goes back in the stream, there's a swell factor. It's actually going to be putting more material back in the stream than it took out because the rock is under pressure and then expands. And so these are really significant impacts, significant disturbances to these streams. And it is coal mining. And that is the activity that the court authorizes. And I'd also like to address one of our other arguments which is the failure of the Army Corps to engage in an equivalent scope of review between its consideration of the economic benefits and the environmental harms in this case. The district court correctly noted that the Army Corps violated its regulations when it did that. And this is really important because the heart of NEPA is that there be an informed decision, an unbiased look at the actual impacts of the mine. And because the Corps considered such a broad variety of economic benefits going so far as to consider the kilowatt hours of energy that would be produced from mining coal, but restricted its review of the environmental harms so narrowly, the Army Corps effectively put its thumb on the scale of its NEPA analysis and that's simply not prohibited. And the district court found that to be harmless error, but we fundamentally disagree with that because it really gets to the heart of NEPA, which is informed, unbiased decision making. And that's not what's happened in this case. So even aside from the issues we've just been discussing, we believe appellants prevail even under that issue. I know the government's not going to have a chance to respond to this argument, but I'm pretty sure what they would say, right, is that the district court got this just a little bit wrong. That this balancing that you're talking about, it didn't happen under NEPA, it happened under the Corps' own 404 public interest review. Do you disagree with that? We do. Because I looked at the heading and it did look like it was happening under the 404 guidelines. And that may be because of a mistake we made in our briefing. In our opening brief, the portion of the joint appendix that we cited to was under the public interest analysis. However, in our reply brief, we cited to the actual heart of the NEPA analysis, which is the consideration of alternatives. That's earlier in the document, that is definitively within the NEPA analysis, and that's where the reference to the kilowatt hours comes from. Not from the public interest. So I would direct you to the section of our reply brief on that issue, which goes to the actual NEPA analysis, not the Clean Water Act analysis. And finally, just to address the issue of the actual scope of what was authorized here, at JA 537 to 38, the Army Corps itself identified the impacts as 41 acres, and that's because that includes the riparian area, and the Arikoma Court itself acknowledged that the core scope of jurisdiction includes that riparian area. Thank you. Thank you very much. We will come down Greek Council and proceed directly to the next case.
judges: Allyson K. Duncan, James A. Wynn Jr., Pamela A. Harris